**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| PARKER SCHOOL UNIFORMS, LLC, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Case No. 18-10085 (CSS) |
| _____ | ) | |
| JEOFFREY L. BURTCH, | ) | |
| CHAPTER 7   TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Pro. No.  (CSS) |
| | ) | |
| | ) | |
| SUSEN M. SARPA, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT TO AVOID TRANSFERS AND/OR OBLIGATIONS**
**PURSUANT TO 11 U.S.C. §§ 544, 547, 548 AND 6 DEL. C. §§ 1304 AND 1305, NC GEN**
**STAT § 39-23 *et seq*., AND TEX. BUS. & COM. CODE SEC. 24.001 *et seq*.**
**TO RECOVER PROPERTY TRANSFERRED PURSUANT TO 11 U.S.C. § 550**

Jeoffrey L. Burtch, Chapter 7 Trustee (the "Trustee" and/or "Plaintiff") for the

bankruptcy estate (the "Estate") of Parker School Uniforms, LLC ("Parker" or the "Debtor"),

Plaintiff in this adversary proceeding, by his undersigned attorneys, in support of this complaint

(the "Complaint") to avoid and recover preferential and constructively fraudulent transfers and

obligations against Susen M. Sarpa ("Sarpa" and/or the "Defendant"), hereby alleges upon

information and belief that:

**NATURE OF THE CASE**

1.      Pursuant to sections 547, 548, 544, and 550 of Title 11 of the United States Code,

11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code") and sections 1304(a)(2), 1305(a), and 1305(b)

of Chapter 13 of Title 6 of the Delaware Code, 6 Del.C. § 1301 *et seq*. (the "Delaware Code"),

and/or in the alternative the North Carolina Uniform Voidable Transactions Act "UVTA", NC Gen. Stat. § 39-23 *et seq*., and/or the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code Sec. 24.001 *et seq*. ("TUFTA"). This Complaint seeks to avoid and recover from the Defendant, or from any other person or entity for whose benefit the transfers were made, all preferential and fraudulent transfers of property made to or for the benefit of Defendant by the Debtor during the applicable ninety-day, one-year, two-year, and four-year periods prior to the filing of the Debtor's bankruptcy petition. The transfers that the Plaintiff seeks the avoidance and recovery total an amount not less than **$170,557.19** (the "*Transfers*") made to Parker's Vice President of Merchandising, Sarpa, as preferential and voidable constructive fraudulent transfers. The Transfers must be avoided pursuant to above cited sections of the Bankruptcy Code and Delaware and/or North Carolina and/or Texas Code and Sarpa must return the Transfers to Parker.

2.      To the extent that the Defendant has filed a proof of claim or has otherwise requested payment from the Debtor or the Estate, (collectively, the "Claim"), this Complaint is not intended to be, nor should it be construed as, a waiver of the Plaintiff's right to object to such Claim for any reason, including, but not limited to, 11 U.S.C. § 502(a) through (j) of the Bankruptcy Code, and such rights are expressly reserved.  Notwithstanding this reservation of rights, certain relief pursuant to 11 U.S.C. § 502 may be sought by the Plaintiff herein and as further stated below.

## JURISDICTION

3.      This Court has subject matter jurisdiction over this adversary proceeding, which arises under Title 11, arises in, and relates to a case under Title 11, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 18-10085

(CSS) (the "Bankruptcy Case"), pursuant to 28 U.S.C. §§ 157 and 1334(b) and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012.

4.      In accordance with Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiff hereby states that it consents to the entry of final orders or judgments by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

5.      The statutory and legal predicates for the relief sought herein are Sections 502, 544, 547, 548, and 550 of the Bankruptcy Code, and Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

6.      This adversary proceeding is a "core" proceeding to be heard and determined by the Bankruptcy Court pursuant to 28 U.S.C. § 157(b)(2) and the Bankruptcy Court may enter final orders for the matters contained herein.

7.      Venue is proper in the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      Nationwide service of process by first-class mail postage prepaid is available pursuant to Bankruptcy Rule 7004(b) and (d).

## PROCEDURAL HISTORY AND BACKGROUND

9.      On January 12, 2018 (the "Petition Date"), Parker School Uniforms, LLC commenced this Bankruptcy Case, by filing a voluntary petition for relief under chapter 7 of the Bankruptcy Code.

10.     On or about January 16, 2018, Jeoffrey L. Burtch was appointed as chapter 7 interim trustee in the Bankruptcy Case. On February 15, 2018, a meeting of creditors was held pursuant to Section 341 of the Bankruptcy Code (the "341 Meeting").[1] The 341 Meeting was continued and ultimately concluded on March 23, 2018. Mr. Burtch continues to serve as the Trustee pursuant to Section 702(d) of the Bankruptcy Code.

11.     Prior to the Petition Date, Parker operated a distribution center and warehouse facility in Houston, TX, as well as approximately forty-seven (47) retail stores in ten (10) states for the sale of school uniforms.

12.     The ninety-day period prior to the Petition Date is from October 14, 2017 through January 12, 2018 (the "Preference Period").

13.     Plaintiff has commenced this adversary proceeding to avoid and recover from Defendant or any other person or entity for whose benefit Transfers were made pursuant to sections 544, 547, 548 and 550 of the Bankruptcy Code, and 6 Del. C. §§ 1304(a)(2), 1305(a), and 1305(b) of the Delaware Code, the North Carolina Uniform Voidable Transactions Act "UVTA", NC Gen. Stat. § 39-23 *et seq.*, and/or the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code Sec. 24.001 *et seq.* ("TUFTA") and any Transfers that may have been preferential and/or federal and/or state constructive fraudulent conveyances. As described further below, the Transfers were all made to Defendant while the Debtor was insolvent and for which the Debtor did not receive reasonably equivalent (or any) value and are in the form of "Salary, Bonus, Vacation" Transfers paid by the Debtor to Defendant. All such Transfers are identified in **Exhibit A.**

---

[1] Excerpts of the *Transcript of 341 Meeting of Creditors of Mark Gillis Dated February 15, 2018* ("341 Meeting Transcript") are attached hereto as <u>Exhibit B</u> and incorporated by reference.

14.    The one-year period prior to the Petition Date applicable to insiders pursuant to 11 U.S.C. § 547(b)(4)(B) and 6 Del. C. §1305(b), N.C. Gen. Stat. § 39-23.5(b), and TUFTA §24.006(b) is from January 13, 2017 through January 12, 2018 (the "Insider Preference Period").

15.    The two-year period prior to the Petition Date is from January 13, 2016 through January 12, 2018 (the "548 Transfer Period").

16.    The four-year period prior to the Petition Date is from January 13, 2014 to January 12, 2018 (the "Delaware Code Four Year Transfer Period").[2]

17.    Defendant Susen M. Sarpa is an individual residing in San Antonio, Texas, and may be served with process at 141 W. Avenida San Antonio, San Clemente, CA 92672. Defendant was an employee of Parker, and an investor in Parker in the June 25, 2015 sale. Sarpa is an "insider", as Vice President of Merchandising, she is an officer of the Debtor pursuant to 11 U.S.C. § 101(31)(B)(ii) and 6 *Del. C.* §1301(7)(b)(2), TUFTA §24.002(7), or NC Gen. Stat. § 39-23.1(7); and/or 6 Del. C. §1301(1), TUFTA §24.002(1), or NC Gen. Stat. § 39-23.1(1).  Upon information and belief Sarpa had an "Executive Employment Agreement" with Parker (the "Employment Agreement").

**FACTUAL BACKGROUND**

18.    On June 9, 2015, Salem Investment Partners III, Limited Partnership ("Salem LP") formed PSU Holdings, LLC ("PSU Holdings"), a Delaware limited liability company, for the purpose of investing in, and soliciting investments for, the purchase of all membership interests in the Debtor.

---

[2] The defined Delaware Code Four Year Transfer Period is applicable for all transfers under 6 Del. C. § 1309, TUFTA §24.010(1) and (2), and N.C. Gen. Stat. § 39-23.9 a statute of repose where all the alleged acts herein occurred within the defined four years.

19.     Effective June 9, 2015, Salem LP was the sole member and owner of one hundred percent (100%) of PSU Holdings.

20.     On or about June 25, 2015, PSU Holdings purchased the outstanding units of Parker School Uniforms, LLC from Blue Sage Capital, L.P. ("Blue Sage"), Shuford Interests, L.P., KMS Family Holdings, Inc., Troy Pike ("Pike"), Mike Porter ("Porter"), Barbara Cohen, Bobbie Kopkin, and Jon Stevens (collectively, the "Sellers") for cash consideration of $20,601,750 (the "June 25, 2015 Sale").

**The PSU Holdings Investment Agreement**

21.     On June 25, 2015, PSU Holdings and the following investors (the "Investors") entered into an investment agreement (the "Investment Agreement")[3] regarding PSU Holdings and Parker: Salem LP, Argosy Investment Partners V, L.P. ("Argosy Partners"), Argosy Investment Partners Parallel V, L.P. ("Argosy Parallel")[4], Plexus Fund III, L.P. ("Plexus L.P."), and Plexus Fund QP III, L.P. ("Plexus QP")[5].

22.     Pursuant to section 2.1 of the Investment Agreement, PSU Holdings was authorized to sell to the Investors of its senior subordinated promissory notes (the "Subordinated Notes") in the aggregate principal amount of $13,500,000.

23.     Pursuant to section 2.2 of the Investment Agreement, PSU Holdings was authorized to issue to the Investors 1,160,000 Class B Units.

---

[3] A copy of the "Investment Agreement among PSU Holdings, LLC, Salem Investment Partners III, Limited Partnership, Argosy Investment Partners V, L.P., Argosy Investment Partners Parallel V, L.P., Plexus Fund III, L.P., and Plexus Fund QP III, L.P" is attached hereto as Exhibit C.

[4] To the extent not otherwise defined herein, "Argosy" shall have the meaning as set forth in the Investment Agreement and shall include, collectively, Argosy Partners and Argosy Parallel.

[5] To the extent not otherwise defined herein, "Plexus" shall have the meaning as set forth in the Investment Agreement and shall include, collectively, Plexus L.P., and Plexus QP.

24.    Pursuant to section 2.3 (Purchase and Sale of Subordinated Notes) and 2.4 (Issuance of Class B Units) of the Investment Agreement, each of the Investors agreed to purchase Subordinated Notes, and be issued Class B Units, from PSU Holdings as set forth in the Schedule 1 of the Investment Agreement, as set forth immediately below[6]:

| **Investor** | **Subordinated Notes** | **Class B Units** |
|---|---|---|
| Argosy Partners | $1,388,899.50 | 115,913 |
| Argosy Parallel | $111,100.50 | 9,272 |
| Plexus L.P. | $3,000,000.00 | 250,370 |
| Plexus QP | $3,000,000.00 | 250,370 |
| Salem LP | $6,000,000 | 500,741 |
| **TOTALS:** | **$13,5000,000** | **1,126,666** |

25.    The issuance of Class B units was in proportion to the amount of Subordinated Notes purchased.

26.    Pursuant to section 2.10 of the Investment Agreement, all indebtedness of PSU Holdings to any Investor was to be guaranteed jointly and severally by the Guarantors, as evidenced by and subject to the terms of guaranties in form and substance satisfactory to the Investors.[7]

---

[6] Argosy, Plexus, and Salem LP are sometimes referred to herein as the "Subordinated Note Holders".

[7] Per the Investment Agreement, "Guarantors" is defined as the Subsidiary Guarantors.

"Subsidiary Guarantors" is defined as "collectively or individually as the context may indicate, each Subsidiary who from time to time becomes a party to the Subsidiary Guaranty Agreement on or after the Closing Date."

"Subsidiary Guaranty Agreement" is defined as the Subsidiary Guaranty Agreement made by each Subsidiary in favor of the Investor Agent (as defined in the Subordination Agreement) for the benefit of itself and the other Investors.

27.     Pursuant to section 2.12 of the Investment Agreement, the Subordinated Notes were to be subordinated to the Senior Indebtedness to the extent set forth in the Intercreditor Agreement (as those terms are defined in the Investment Agreement.)

28.     Pursuant to section 6.16(b) of the Investment Agreement, "[t]he Company shall permit one authorized representative of each of Salem, Plexus and Argosy (and their successors) to attend and participate in all meetings (including any executive session thereof) of its board of directors or managers, as applicable, and any committee thereof, whether in person, by telephone or otherwise."

29.     Pursuant to section 8.1 of the Investment Agreement, all payments under any Subordinated Note shall be payable by draft from PSU Holdings' checking account.

## The Amended PSU Holdings LLC Agreement

30.     On June 25, 2015, PSU Holdings and its members, consisting of Investors Salem LP, SIP III Holdings, Inc. ("Salem Holdings" together with Salem LP, "Salem"),  Plexus L.P., Plexus QP, Argosy Partners, Argosy Parallel, as well as Pike, Porter, Susen Sarpa, and Allison Balthrope ("Balthrope")[8], executed the Amended and Restated Limited Liability Company Agreement of PSU Holdings, LLC, dated June 25, 2015 ("PSU Holdings LLC Agreement" a copy of which is attached as Exhibit D).

31.     Pursuant to section 3.2 of the PSU Holdings LLC Agreement, "[t]he name of each Holder, the number and class of Units issued to each Holder, the Percentage Interest, and Capital Contribution of each Holder as of the date of this Agreement are as set forth on the Unit

---

[8] The PSU Holdings LLC Agreement specifies that Pike, Porter, Sarpa, and Balthrope are "Management Members."

Register" attached as Exhibit A to the PSU Holdings LLC Agreement (the "Original Unit Register"). The Original Unit Register reflects the following:[9]

| Investor | Class/Number of Units | Percent Interest | Capital Contributions |
|---|---|---|---|
| Salem LP | Class A: 1,801,696<br>Class B: 500,741 | 21.91% | $1,801,696.00 |
| Salem Holdings | Class A: 278,304 | 2.53% | $278,304.00 |
| Plexus LP | Class A: 520,000<br>Class B: 250,370 | 6.99% | $520,000.00 |
| Plexus QP | Class A: 520,000<br>Class B: 250,370 | 6.99% | $520,000.00 |
| Argosy Partners | Class A: 4,333,366<br>Class B: 115,913 | 40.40% | $4,333,366.00 |
| Argosy Parallel | Class A: 346,634<br>Class B: 9,272 | 3.23% | $346,634.00 |
| Pike | Class A: 300,000<br>Incentive: 901,333 | 10.91% | $300,000.00 |
| Porter | Class A: 100,000<br>Incentive: 197,167 | 2.70% | $100,000.00 |
| Sarpa | Class A: 125,000<br>Incentive: 169,000 | 2.67% | $125,000.00 |
| Balthrope | Class A: 125,000<br>Incentive: 169,000 | 2.67% | $125,000.00 |
| **Total Class A:**<br>**Total Class B:**<br>**Total Incentive:** | **8,450,000**<br>**1,126,667**<br>**1,436,500** | | **Total Capital:**<br>**$8,450,000.00** |

32.     Pursuant to section 3.3 of the PSU Holdings LLC Agreement, "[e]ach Class A Holder as of the date hereof shall make a Capital Contribution to the Company in the form of

---

[9] The "Percent Interest" amounts set forth in the Original Unit Register totals 101%.

cash and/or other assets in exchange for the Class A Units specified for such Holding on [the Original Unit Register]."

33.    Pursuant to section 4.3 of the PSU Holdings LLC Agreement, Salem was entitled to elect and appoint two members of the PSU Holdings board of managers (the "Board"). Adam Norris and Meredith Jolly were initially appointed by Salem.

34.    Pursuant to section 4.3 of the PSU Holdings LLC Agreement, Argosy was entitled to elect and appoint two members of the Board. Keven P. Shanahan and Lane W. Wiggers were initially appointed by Argosy.

35.    Sarpa was a unitholder of Parker's sole member prior to Parker's bankruptcy, having invested $144,344.00 in PSU Holdings, LLC for 144,344.00 Class A units, and 169,000 Class C units.  In total as of September 14, 2017, and upon information and belief at the Petition Date, Sarpa had 144,344.00 Class A units, and 169,000 Class C units for 2.59% of the total units. In total Sarpa invested $144,344.00 or 1.40% of the total amount invested in PSU Holdings, the sole member of Parker.

**The Amended and Restated Limited Liability Agreement of Parker School Uniforms LLC**

36.    On June 25, 2015, Parker and PSU Holdings entered into and executed the Amended and Restated Limited Liability Agreement of Parker School Uniforms LLC (the "Parker LLC Agreement").

37.     Pursuant to the Parker LLC Agreement, PSU Holdings, LLC was the sole member.

38.    The Parker LLC Agreement appointed the following persons as the initial officers of Parker:

a.  Pike          President
b.  Porter        Vice President of Sourcing and Secretary

    c.   Sarpa        Vice President of Merchandising
    d.   Balthrope    Vice President of Sales & Marketing

39.     Pike executed the Parker LLC Agreement as President of both PSU Holdings and Parker.

### Frost Bank Senior Debt and Subordination Agreement

40.     On January 14, 2011, Parker and Frost Bank ("Frost Bank") entered into the "Amended and Restated Loan Agreement dated January 14, 2011" (as amended, supplemented or otherwise modified, the "Frost Loan Agreement" and/or "Frost Bank $20,000,000 Senior Facility").

41.     On or about December 1, 2012, Frost Bank made a loan to Parker under the Frost Loan Agreement evidenced by a promissory note executed by Parker and payable to the order of Frost Bank in the original principal amount of $20,000,000.00 (the "Frost Note"). The Frost Note was a renewal and extension of a series of promissory notes dating back to 2008.

42.     The Frost Note was secured by a Commercial Security Agreement, dated August 7, 2008 (the "Frost Security Agreement") executed by Parker as grantor and for the benefit of Frost Bank.

43.     On June 25, 2015, in conjunction with the June 25, 2015 Sale, Frost Bank and Parker entered into "Amendment No. 5 to Amended and Restated Loan Agreement." (the "5th Frost Amendment," a copy of which is attached hereto as Exhibit E).

44.     Pursuant to paragraph 1 of the 5th Frost Amendment, on June 25, 2015, the outstanding principal balance of the Borrowing Base Line of Credit was $16,351,079.00, with $2,837,222.00 available for drawing.

45.    Pursuant to paragraph 2(b) of the 5th Frost Amendment, the fourth and fifth paragraphs of Section 1(a) of the Frost Loan Agreement were deleted, and the following paragraphs were substituted:

> An amount of eighty percent (80%) of the Borrower's Eligible Accounts, plus an amount equal to eighty percent (80%) of the Borrower's Eligible Inventory from February 1st to August 15th each year, and sixty percent (60%) of the Borrower's Eligible Inventory during the period from August 16th to January 31st each year.
>
> […]
>
> As used herein, the term "Eligible Inventory" shall mean as of any date, the aggregate value of all inventory of raw materials and finished goods (excluding work in progress and packaging materials, supplies and any advertising costs capitalized into inventory) then owned by Borrower and held for sale, lease or other disposition in the ordinary course of its business, in which Lender has a first priority lien, **excluding (i) inventory which is damaged, defective, obsolete or otherwise unsaleable in the ordinary course of Borrower's business**. . . [emphasis supplied].

46.    On June 25, 2015, in conjunction with the June 25, 2015 Sale, Frost Bank and PSU Holdings entered into a Guaranty Agreement (the "PSU Guaranty") whereby PSU Holdings guaranteed all indebtedness, obligations, and liabilities of Parker to Frost Bank under the Frost Loan Agreement, Frost Note, and the Frost Security Agreement.

47.    On June 25, 2015, Frost Bank as secured party (the "Secured Party"), PSU Holdings as grantor ("Grantor"), and Parker as borrower ("Borrower"), executed the "Pledge and Security Agreement", whereby PSU Holdings granted Frost Bank a security interest PSU Holdings collateral of 100% of Grantor's membership interest in Parker.

48.    On June 25, 2015, in conjunction with the June 25, 2015 Sale, Parker, PSU Holdings, the Subordinated Note Holders, and Frost Bank entered into the "Subordination, Intercreditor and Negative Pledge Agreement" (the "Subordination Agreement," a copy of which is attached hereto as Exhibit F).

49.    Pursuant to section 6.2 of the Subordination Agreement:

Until the Senior Loan Termination Date, and notwithstanding anything to the contrary contained in the Subordinated Note Documents, the Subordinated Note Holders shall not, without the prior written consent of Frost Bank, agree to any amendment, modification or supplement to the Subordinated Note Documents the effect of which is any of the following: (a) increase the maximum principal amount of the Subordinated Notes Obligations to exceed $13,500,000.00. . .

**The Dixon Hughes Audit**

50.    On or about May 10, 2017, Dixon Hughes Goodman LLP ("Dixon Hughes") issued its "PSU Holdings, LLC and Subsidiary Consolidated Financial Statements" (the "Dixon Hughes Financial Statement" or "DHFS," a copy of which is attached hereto as Exhibit G) for the years 2016 and 2015.

51.    Pursuant to the Dixon Hughes Financial Statement, effective June 25, 2015, PSU Holdings purchased the outstanding units of Parker for cash consideration of $20,601,750 (the "Purchase Price"). DHFS, p. 9. The purchase was funded with the funds raised via the equity investment of $8,450,000 and subordinated debt of $13,500,000. DHFS, pp.11-2, 14.

52.    Pursuant to the Dixon Hughes Financial Statement:

On June 25, 2015, the Company entered into five subordinated term notes with members. All notes accrue interest at an annual rate of 11% plus the deferred interest rate of 1.5% for an aggregate rate of 12.5%. Interest is payable in arrears on the first day of each month through the maturity date in June 2020, at which time the full principal balance shall be due along with any accrued but unpaid interest. The notes are subordinated to the revolving line of credit and contain covenants with respect to certain financial ratios, with which the Company was in compliance at December 31, 2016 and 2015. The balance on these notes was $13,816,194 and $13,607,227 at December 31, 2016 and 2015, respectively, which includes $13,500,000 of principal as of December 31, 2016 and 2015 and $316,194 and $107,227 of unpaid deferred interest as of December 31, 2016 and 2015, respectively.

*DHFS*, p. 11.

53.    Pursuant to the Dixon Hughes Financial Statement:

On June 16, 2016, the Company entered into six subordinated term notes with members. All notes accrue interest at an annual rate of 11% plus the deferred interest rate of 1.5% for an aggregate rate of 12.5%. Interest is payable in arrears

on the first day of each month through the maturity date in June 2017, at which time the full principal balance shall be due along with any accrued but unpaid interest. The notes are subordinated to the revolving line of credit and contain covenants with respect to certain financial ratios, with which the Company was in compliance at December 31, 2016. The balance on these notes was $1,000,097 at December 31, 2016, which includes $991,956 of principal and $8,141 of unpaid deferred interest.

*DHFS*, p. 12.

54.     According to the Dixon Hughes Financial Statement, the interest expense under all subordinated notes was $1,809,228 and $893,565 (unaudited) for the year ended December 31, 2016 and the period from June 25, 2015 through December 31, 2015, respectively. *DHFS*, p. 12.  The total subordinated debt as of December 21, 2016 as set forth in the Dixon Hughes Financial Statement was $14,403,119.

55.     Pursuant to the Dixon Hughes Financial Statement, on June 25, 2015, Parker issued 8,450,000 of Class A units at a price of $1 per unit, totaling $8,450,000, of which $8,350,000 was paid in cash. *DHFS*, p.14.

56.     Pursuant to the Dixon Hughes Financial Statement, on June 25, 2015, Parker also issued 1,126,666 Class B units and 1,436,500 Incentive units for $0. *DHFS*, p. 14.

57.     Pursuant to the Dixon Hughes Financial Statement, during the year ended December 31, 2016, Parker issued 1,885,001 Class A units for $1,885,000 in cash. Parker also issued 225,334 Incentive units for $0. *DHFS*, p. 14.

58.     Pursuant to the Dixon Hughes Financial Statement, the tangible and identifiable assets acquired and liabilities assumed were recognized at their estimated fair values as of the acquisition date, with the excess of consideration over the estimated fair values of the net assets acquired allocated to goodwill. *DHFS*, p. 10.

59.     The tangible and intangible assets and liabilities identified in the Dixon Hughes Financial Statements include:

      a. Inventory in the amount of $27,117,532;
      b. Line of Credit liability in the amount of $16,057,079; and
      c. Goodwill in the amount of $10,537,021.

*DHFS*, p. 10.

    60.    The Dixon Hughes Financial Statement states that as of December 31, 2015, total assets of $34,665,514, and total liabilities of $23,503,071. *DHFS*, p. 3.

    61.    The Dixon Hughes Financial Statement states that as of December 31, 2015, Parker had inventory valued at $22,849,397, with a reserve of obsolete inventory in the amount of $1,693,727, leaving a total inventory value totaling $21,155,670. *DHFS*, p. 10.

    62.    The Dixon Hughes Financial Statement states that as of December 31, 2016, total assets of $37,301,549, and total liabilities of $28,195,099. *DHFS*, p. 16.

    63.    The Dixon Hughes Financial Statement indicated as of December 31, 2016, there was $22,738,084 in inventory, with a reserve of obsolete inventory of $135,110, leaving a total inventory amount of $22,602,974. *DHFS*, p. 10.

    64.    The Dixon Hughes Financial Statement indicated as of December 31, 2016, for the fiscal year ending December 31, 2016, PSU Holdings and Parker had an audited net loss of ($2,698,317). *DHFS*, p. 16.

    65.    The Dixon Hughes Financial Statement states:

### *Basis for Disclaimer of Opinion on Results of Operations and Cash Flows*

The Company's accounting records did not permit us to extend our auditing procedures to obtain sufficient evidence about inventory costs and quantities on June 25, 2015, stated at $27,117,532. The amount of the inventory at June 25, 2015, materially affects the determination of the results of operations and cash flows for the period from June 25, 2015 (inception) through December 31, 2015.

*DHFS*, p. 2.

### Amendment No. 7 to Frost Loan Agreement

66.     On December 27, 2016, Frost Bank and Parker entered into the Amendment No. 7 to Amended and Restated Loan Agreement and Modification, Renewal and Extension Agreement (the "7th Frost Amendment"). *See* [D.I. 23-1, pp. 15-28].

67.     Pursuant to the 7th Frost Amendment, the outstanding principal of the Frost Note on December 27, 2016 was $12,015,992.00.

68.     The 7th Frost Amendment provided that the second paragraph of Section 1(a) of the Loan Agreement shall be replaced with the following (the "Loan Rest Covenant"):

> During the period beginning on the date of Amendment No. 7 and ending October 31, 2017, Borrower covenants and agrees that (i) there shall be a period of at least fourteen (14) consecutive days during which (a) there are no Borrowing Base Advances outstanding and  (b) no Borrowing Base Advances will be made; and (ii) there shall be a period of at least thirty (30) consecutive days during which there are no Borrowing Base Advances that exceed $2,000,000.

69.     The 7th Frost Amendment provided that Section 6(c) of the Loan Agreement is to be deleted and replaced with:

> (c)     Conditions Precedent to Effectiveness of Amendment No. 7. As a condition precedent to the effectiveness of Amendment No. 7 and as a condition precedent to the Lender's obligation to continue to make Borrowing Base Advances to Borrower, Borrower agrees to cause its equity to be increased by no less than $1,385,000 on or prior to the date Amendment No. 7 is signed by the parties thereto.

70.     Upon entry into the 7th Frost Amendment, Parker's liquidity and access to credit was greatly curtailed and reduced.

71.     Upon entry into the 7th Frost Amendment, Parker and PSU Holdings was required to invest additional equity to maintain the use of the Frost Loan.

72.     Upon information and belief, the $1,385,000 in additional funded equity as required under the amended Section 6(c) was for the purpose a partial pay-down on the outstanding Frost Loan. No additional monies were funded as cash to Parker.

**First Additional Advances of Alleged Credit to Parker**

73.     On June 14, 2016, Parker, PSU Holdings, and Frost Bank entered into the First Amendment to Subordination, Intercreditor and Negative Pledge Agreement (the "Amended Subordination Agreement"). *See* [D.I. 23-1, p. 17].

74.     The Amended Subordination Agreement permitted the Investors and Salem Holdings to increase the amount of the Subordinated Notes.

75.     On June 16, 2016, Argosy Parallel, an equity insider, lender and creditor, advanced Parker $39,535.00 under a subordinated note, and Argosy Partners, an equity insider, lender, and creditor, advanced Parker $494,482.00 under a subordinated note (collectively the "Argosy 2016 Subordinated Notes").   *See* [D.I. 3], Schedule of Assets and Liabilities (the "Schedules") Schedule E/F, Part 2, 3.3 and 3.6.

76.     On June 16, 2016, Salem LP, an equity insider, lender, and creditor, advanced Parker $255,931.00 under a subordinated note, and Salem Holdings, an equity insider, lender, and creditor, advanced Parker $30,898.00 under a subordinated note (collectively the "Salem 2016 Subordinated Notes").  *See* [D.I. 3], Schedule E/F, Part 2, 3.17 and 3.21.

77.     On June 16, 2016, Plexus LP, an equity insider, lender, and creditor, advanced Parker $85,555.00 under a subordinated note, and Plexus QP, an equity insider, lender, and creditor, advanced Parker $85,555.00 under a subordinated note (collectively the "Plexus 2016 Subordinated Notes").  *See* [D.I. 3], Schedule E/F, Part 2, 3.11 and 3.14.

78.     On December 27, 2016, Argosy Investment Partners V, L.P. a Delaware limited partnership, and PSU Holdings, executed a "Note Modification Agreement No. 1" extending the term due date on the face of the Note from "Due June 15, 2017", to "Due December 1, 2017".

79.      On December 27, 2016, Argosy Investment Partners Parallel V, L.P. a Delaware limited partnership, and PSU Holdings, executed a "Note Modification Agreement No. 1"

extending the term due date on the face of the Note from "Due June 15, 2017", to "Due December 1, 2017".

80.     On December 27, 2016, Plexus Fund III, L.P., a Delaware limited partnership, and PSU Holdings, executed a "Note Modification Agreement No. 1" extending the term due date on the face of the Note from "Due June 15, 2017", to "Due December 1, 2017".

81.     On December 27, 2016, Plexus Fund QP III, L.P., a Delaware limited partnership, and PSU Holdings, executed a "Note Modification Agreement No. 1" extending the term due date on the face of the Note from "Due June 15, 2017", to "Due December 1, 2017".

82.     On December 27, 2016, Salem Investment Partners III Limited Partnership, a North Carolina limited partnership, and PSU Holdings, executed a "Note Modification Agreement No. 1" extending the term due date on the face of the Note from "Due June 15, 2017", to "Due December 1, 2017".

83.     On December 27, 2016, SIP III Holdings, Inc., a North Carolina corporation, and PSU Holdings, executed a "Note Modification Agreement No. 1" extending the term due date on the face of the Note from "Due June 15, 2017", to "Due December 1, 2017".

**Parker's Disclosure Issue With December 31, 2016 Write-Off of Inventory**

84.     In the last months before the Petition Date, Parker admitted they had they had $7 to $10 million in obsolete worthless inventory.  However, how Parker dealt with a much smaller inventory writeoff number for the fiscal year ending December 31, 2016, illustrates Parker was questioning disclosure of numbers so Frost Bank would not declare Parker in violation of their financial covenants, and upon information and belief to preserve the value of their enterprise.

85.     On January 16, 2017, Parker had a potential write-off of $377,405.00 as an "Inventory Final Adjustment to Actual 2016".[10]

86.     However, in a January 23, 2017 document Parker identifies $1,706,277, in obsolescence inventory on hand in 2015 that did not sell in 2016.[11]

87.     A January 28, 2017 document entitled "Parker School Uniforms LLC Fixed Charge Covenant Ration – FY 2016" illustrates Parker's recognition of their inventory write-off problem if they disclosed it to Frost Bank.

   a.     In a red highlighted note (the "Red Note") Parker states:
   "Note: Frost Bank likely will not accept the 2016 inventory write-down and obsolescence reserve totaling $938,186 as a Non-Cash/Non-Recurring Loss which would reduce the FCCR to 1.35 as of 12/31/16";[12]

   b.     For the "2016 Actuals", the $989,300 appears in the "Dec" and "Total" columns for "Plus non cash addbacks / Less non-cash gains";[13] and

   c.     The $938,186 was noted as an "Inventory Writedown & Obsolescence" and an "Inventory Obsolescence Writeoff" for December 31, 2016.[14]

88.     The next day, a January 29, 2017 document entitled "Parker School Uniforms LLC Fixed Charge Covenant Projection – FY 2017", has:

   a.     "2017 Fixed Charge Covenant Proj" with notes highlighted in red, which states:

   Notes:

   "- We do not have adequate FCCR coverage to allow a pay-off of the $991,956 Tax Note as planned in the 2017 Budget (without a waiver by Frost) as highlighted above in orange.

---

[10] *See* "12-December 16 General Journals.xls", the tab "Journal Entries".
[11] *See* "2016 Obsolescence Reserve -Active item Not Sold – v3.1.23.17(002).xlsx, "Parker School Uniforms LLC, Obsolescence Reserve As of 12/31/16", the tab: "Summary".
[12] *See* "2017 Loan Covenant Projection_1_28_17.xlsx", the tab: "2016 Fixed Charge Covenant Proj", a copy of which is attached hereto as Exhibit N).
[13] *See* Exhibit N, "2017 Loan Covenant Projection_1_28_17.xlsx", the tab: "Adjusted EBIDA Support".
[14] *See* Exhibit N, "2017 Loan Covenant Projection_1_28_17.xlsx", the tab: "Non-Cash, Non Recurring Exp".

"- Frost Bank likely will not accept the 2016 inventory write-down and obsolescence reserve totaling $938,186 as a Non-Cash/Non-Recurring Loss which would reduce the FCCR to 1.35 as of 12/31/16.

"If Frost did not accept the $938,186 Non-Cash/Non-Recurring Loss, we would fail the FCCR ratio in Q1 and Q2 of FY 2017 as highlighted below in yellow."

b.      "Adjusted EBIDA Support", for "2016 Actual" has the $989,300 appearing twice for "Dec" and "Total" for "Plus non cash addbacks / Less non-cash gains".[15]

89.     Parker in January 2017 recognizes they have two issues if disclosed to Frost Bank would have Parker in violation of the Frost Bank Loan covenants, so what would Parker do?

90.     An April 5, 2017 document entitled "Parker School Uniforms LLC Fixed Charge Covenant Ration – FY 2016" deleted the highlighted "Red Note in its entirety re the $938,186, and has a new number for December 21, 2016 "2016 Actuals", deleting the $938,186 writedown/writeoff of inventory in its entirety in the document.

a.      The "2016 Fixed Charge Covenant Proj", the Red Note at the bottom is missing, and in the Q4 last Column the "$989,300" disappears and is written down on line 4 as only $51,114 for the Non-Cash/Non-Recurring Loss.

b.      The "Adjusted EBIDA Support", has a new "2016 Actual". The $989,300 disappears, now $51,114 appears twice for the "Dec" and "Total" columns, and for "Plus non cash addbacks / Less non-cash gains".

c.      The "Non-Cash, Non Recurring Exp", for the "Dec" and "Total" columns note the $938,186 and the $989,300 are deleted and only the $51,114 appears, (5x's).[16]

91.     Parker is not identifying from December 2016 to April 2017, $7 to $10 million in worthless inventory, but it does appear they have identified at least $938,186 in write-off

---

[15] *See* "2017 Loan Covenant Projection_1_29_17.xlsx", a copy of which is attached hereto as <u>Exhibit O</u>).
[16] *See* "2016 Loan Covenant Projection_4_5_17.xlsx", a copy of which is attached hereto as <u>Exhibit P</u>).

inventory, and in order not to violate the Frost Bank Loan covenants, they achieve a different goal number of $51,114 so as not to be in violation of the covenants.

92.     Frost Bank did not declare Parker in violation or default of the Frost Loan Covenants in January through April of 2017.

93.     Yet, the Parker Insiders, and/or Management Members, and/or Officers took "Salary, Bonus, and Vacation", and/or Severance, and/or payments of interest on their subordinated notes in 2017, while knowing they would be in violation of the Frost Loan Covenants if certain information was properly disclosed to Frost Bank.

**Second Additional Advances of Alleged Credit to Parker**

94.     On November 8, 2017, Argosy Parallel funded Parker via a "subordinated note" in the amount of $20,578.00, and on November 8, 2017, Argosy Partners funded Parker via "subordinated note" in the amount of $257,256.00 (collectively the "Argosy Nov. 2017 Notes"). *See* [D.I. 3], Schedule E/F, Part 2, 3.4 and 3.7

95.     On November 8, 2017, Salem LP funded Parker via "subordinated note" in the amount of $123,482.00, and on November 17, 2017, Salem LP funded Parker via "subordinated note" in the amount of $400,000, (collectively the "Salem LP Nov. 2017 Notes"). *See* [D.I. 3], Schedule E/F, Part 2, 3.16 and 3.19.

96.     On November 8, 2017, Plexus LP and Plexus QP each funded Parker via "subordinated notes" each in the amount of $30,871.00, (collectively the "Plexus Nov. 2017 Notes"). *See* [D.I. 3], Schedule E/F, Part 2, 3.12 and 3.15

**Additional Advances of Alleged Equity to Parker**

97.     Upon information and belief, during the second quarter of 2016, Sarpa[17] as Vice President of Merchandising of Parker invested an additional $19,344.00 in PSU Holdings in exchange for 19,344.00 units of Class A units in PSU Holdings.

98.     Pursuant to the 7th Frost Amendment, Parker and PSU Holdings, through its Investors, were required to invest an additional $1,385,000 in equity as a condition precedent to obtaining financing.

99.     Upon information and belief, on or about December 15, 2016, Salem, Plexus, Argosy, Pike, Sarpa, and Balthorpe collectively invested an additional $1,385,001 in exchange for 1,385,001 additional Class A units of PSU Holdings, as follows:

| Investors | 2016 Class A Units Issued |
|---|---|
| Salem LP | 300,257 |
| Salem Holdings | 46,380 |
| Plexus LP | 86,659 |
| Plexus QP | 86,659 |
| Argosy Partners | 722,166 |
| Argosy Parallel | 57,767 |
| Troy Pike | 46,425 |

---

[17] Argosy, Salem, Plexus, Pike, Porter, Sarpa, Balthrope and Van der Wiel are all Parker insiders (individually and collectively the "Parker Insiders")

| | |
|---|---|
| Michael Porter | 0 |
| Susen Sarpa | 19,344 |
| Allison Balthrope | 19,344 |
| **Total 2016 Class A:** | **1,385,001** |

**The Parker/PSU Holdings Petition Date Capital Structure**

100.    The PSU Holdings' unitholders, effective December 2016, are as follows:

| | 2015 Class/Number of Units Issued | 2016 Class A Units Issued | Total Units | Percentage of Equity |
|---|---|---|---|---|
| Salem LP | Class A: 1,801,696 Class B: 500,741 | Class A: 300,257 | Class A: 2,101,953 Class B: 500,741 | 20.34% |
| Salem Holdings | Class A: 278,304 | Class A: 46,380 | Class A: 324,684 | 3.14% |
| Plexus LP | Class A: 520,000 Class B: 250,370 | Class A: 86,659 | Class A: 606,659 Class B: 250,370 | 5.87% |
| Plexus QP | Class A: 520,000 Class B: 250,370 | Class A: 86,659 | Class A: 606,659 Class B: 250,370 | 5.87% |
| Argosy Partners | Class A: 4,333,366 Class B: 115,913 | Class A: 722,166 | Class A: 5,055,532 Class B: 115,913 | 48.92% |
| Argosy Parallel | Class A: 346,634 Class B: 9,272 | Class A: 57,767 | Class A: 404,401 Class B: 9,272 | 3.91% |
| Troy Pike | Class A: 300,000 | Class A: 46,425 | Class A: 346,425 | 3.35% |
| Michael Porter | Class A: 100,000 | Class A: 0 | Class A: 100,000 | 0.97% |

| Susen Sarpa | Class A: 125,000 | Class A: 19,344 | Class A: 144,344 | 1.4% |
| Allison Balthrope | Class A: 125,000 | Class A: 19,344 | Class A: 144,344 | 1.4% |
| Don Van der Wiel | Class A: 0 | Class A: 500,000 | Class A: 500,000 | 4.84% |
| **Total Class A:**<br>**Total Class B:** | **8,450,000**<br>**1,126,667** | **1,385,001**<br>**0** | **10,335,001**<br>**1,126,667** | |

101.    The PSU Holdings' Subordinated Noteholders, including amounts alleged to have been advanced pursuant to additional "subordinated notes", effective as of the Petition Date, are as follows:

| Investor | Subord. Notes (eff. 6.25.15) | Class B Units (eff. 6.25.15) | Subord. Notes (eff. 6.16.16) | Subord. Notes (eff. 11.8.17) | Subord. Notes (eff. 11.17.17) |
|---|---|---|---|---|---|
| Argosy Partners | $1,388,899.50 | 115,913 | $494,482.00 | $257,256 | 0 |
| Argosy Parallel | $111,100.50 | 9,272 | $39,535.00 | $20,578 | 0 |
| Plexus L.P. | $3,000,000.00 | 250,370 | $85,555.00 | $30,871 | 0 |
| Plexus QP | $3,000,000.00 | 250,370 | $85,555.00 | $30,871 | 0 |
| Salem LP | $6,000,000 | 500,741 | $255,931.00 | $123,482 | $400,000 |
| Salem Holdings | 0.00 | 0 | $30,898.00 | 0 | 0 |
| **TOTALS:** | **$13,5000,000** | **1,126,666** | **$991,956** | **$463,058** | **$400,000** |

**Parker's Excessive Obsolete Inventory**

102.    According to the 341 Meeting testimony of Mark Gillis ("Gillis"), a member of Salem that sat on the Parker Board, prior to the June 25, 2015 Sale, seller Blue Sage had assured the Investors that the inventory on the books at the time of the June 25, 2015 Sale was usable inventory. *341 Meeting Transcript*, pp. 32-33.

103.    However, Gillis explained at the 341 Meeting how over the many years of Parker's operations, the company accumulated inventory that could not be used anywhere else

because it was part of a uniform program that had either changed or had been terminated. *341 Meeting Transcript*, pp. 32-33.

104.    At some point in 2017, Parker began to evaluate its inventory more carefully. *341 Meeting Transcript*, pp. 32-33.

105.    Parker later determined that an estimated $7 to $10 million of the $22 to $27 million in inventory was un-useable and worthless (the "Obsolete Inventory"). *341 Meeting Transcript*, pp. 32-33.

106.    Parker determined that the Obsolete Inventory effectively eliminated the value of PSU Holdings' equity investment in Parker. *341 Meeting Transcript*, pp. 32-33.

107.    Gillis also testified that PSU Holdings probably did not do their due diligence as well as they should have regarding the Obsolete Inventory. *341 Meeting Transcript*, pp. 32-33.

108.    Accordingly, as of the date of the June 25, 2015 Sale, inventory was overvalued by 25% to 37%.

109.    With the overvaluation of the Obsolete Inventory by $7 to $10 million dollars, Parker was likely insolvent on the day of the June 25, 2015 Sale, and continuously thereafter, as Parker's liabilities exceeded the fair value of its assets from June 25, 2015 until the Petition Date.

110.    Parker, with the overvaluation of the Obsolete Inventory by $7 to $10 million dollars, was undercapitalized from the date of the June 25, 2015 Sale to the Petition Date.

111.    In addition to depleting all of the PSU Holdings invested capital, the Obsolete Inventory, had it been divulged or properly accounted for, would have likely put Parker in default of 5th Frost Amendment and 7th Frost Amendment by over borrowing on their Borrowing Base per the Borrower's Eligible Inventory as those terms are defined in the Frost Bank Loan Agreement, as amended.

112.    A $7 to $10 million reduction in Eligible Inventory would be the equivalent in a reduction in the Borrowing Base by $4.2 to $6 million dollars, depending on the size of the Obsolete Inventory and the seasonal implications as set forth in the 5th and 7th Frost Amendments.

113.    Pike and Porter were part of the Sellers that sold their interests in Parker to PSU Holdings.

114.    Pike was a pre-June 25, 2015 Sale employee of Parker and owner under the Blue Sage ownership group.

115.    Upon information and belief, Pike knew or should have known the quality or amount of Obsolete Inventory as of June 25, 2015.

116.     Pike, as President of PSU Holdings, President of Parker, and a Manager on the Board of Managers, and with a 3.35% equity stake in PSU Holdings, should have communicated his knowledge regarding the Obsolete Inventory to all Parker Insiders.

117.    Likewise, Porter was a pre-June 25, 2015 Sale employee of Parker and owner under the Blue Sage ownership group.

118.    Upon information and belief, Porter knew or should have known the quality or amount of Obsolete Inventory as of June 25, 2015.

119.    Porter, as Vice-President of Sourcing and Secretary of Parker, a "Management Member" under the Holdings Amended LLC Agreement, and with a 1.11% equity stake in PSU Holdings, should have communicated his knowledge regarding the Obsolete Inventory to the Defendant and all Parker Insiders.

120.    Pursuant to Parker's Statement of Financial Affairs ("S.O.F.A." [D.I. 4]), Balthrope, Vice President of Sales & Marketing, had been with Parker for approximately twenty (20) years, (circa 1997). [D.I. 4,] Part 13, #29.

121.    Upon information and belief, Balthrope knew or should have known the quality or amount of Obsolete Inventory as of June 25, 2015.

122.    Balthrope, as Vice President of Sales & Marketing of Parker, a Management Member under the Holdings Amended LLC Agreement, and a 1.39% equity stakeholder of PSU Holdings, should have communicated her knowledge regarding inventory to the Defendant and all Parker Insiders.

### Failed Expansion and Capital Expenditures

123.    After the June 25, 2015 Sale, the Parker Board consisted of: Adam Norris and Meredith Jolley from Salem, Lane Wiggers and Keven P. Shanahan from Argosy, and Pike.

124.    Board observers consisted of Plexus, Van der Wiel, Sarpa, and Porter.

125.    On January 26, 2016, the Parker Board held a board meeting (the "January 2016 Board Meeting") at the corporate headquarters in Houston, Texas.  "In addition to the Chairman [Adam Norris], present at the meeting were Board Managers Meredith Jolly, Troy Pike.  Keven Shanahan and Lane Wiggers attended telephonically.  Alex Bean from Plexus, Allison balthrope from Parker, Mike Porter from Parker and Susen Sarpa from Parker attended the meeting as observers and Mark Gillis from Salem attended telephonically.  Lane Wiggers acted as secretary of the meeting in the absence of a full time CFO."

126.    On April 28, 2016, the Parker Board held a board meeting (the "April 2016 Board Meeting") at the corporate headquarters in Houston.

127.     The April 2016 Board Meeting was attended by Chairman of the Board Adam Norris, Meredith Jolly, Pike, Keven Shanahan, and Lane Wiggers.

128.     Gillis from Salem, and Balthrope, Porter, and Sarpa from Parker were observers attending the April 2016 Board Meeting. Van der Wiel from Parker, and Alex Bean from Plexus attended the April 2016 Board Meeting telephonically.

129.     At the April 2016 Board Meeting the "[b]oard approved the proposed Capital Expenditures for the POS Enhancements, Qless Software Implementation, WiFI Credit Card terminals, Ion Demand Forecasting System Implementation and MARK Stabilization, Enhancements & Mobile Upgrade."

130.     July 2016, "Consent to 2016 Capital Expenditures July 2016" executed signature pages.

131.     On July 27, 2016, the Parker Board held a board meeting (the "July 2016 Board Meeting") in Atlanta, Georgia.   "In addition to the Chairman [Adam Norris], present at the meeting were Board Managers Mark Gills, Troy Pike, Keven Shanahan and Lane Wiggers.  Alex Bean (Plexus), as well as Don Van der Wiel and Cindy Jorgensen from Parker also attended the meeting as observers.  Don Van der Wiel acted as Secretary of the meeting.

"The Board then reviewed the following agenda with the leadership team:

    2015 BTS Observations and Update

    2016 BTS Initiatives and Priorities

    June 2016 Financial Statements

    2016 ERP Replacement

    Atlanta Store Visit Plan

"The Board approved the replacement of the company's legacy ERP, eCommerce and Point-of-Sale systems with NetSuite as discussed in a stand-along meeting on July 11, 2016."

132.    On October 26, 2016, the Parker Board held a board meeting (the "October 2016 Board Meeting") at the corporate headquarters in Houston, Texas.  "In addition to the Chairman [Adam Norris], present at the meeting were Board Managers Mark Gills, Troy Pike, Keven Shanahan and Lane Wiggers.  Alex Bean (Plexus), as well as Don Van der Wiel, Allison Balthrope, Susen Sarpa, Mike Porter, Cindy Jorgensen and Eric Toureilles from Parker also attended the meeting as observers.  Don Van der Wiel acted as Secretary of the meeting."  The Board reviewed among other issues the "2017 Execution Roadmap and Overarching Strategic Initiatives.

133.    Pike and Van der Wiel were responsible for having the new computer system ERB on line in June of 2017 during summer sale season.  *341 Meeting Transcript*, pp. 22-29. The computer system deployed in the fourth quarter of 2016 and went live beginning in May 2017. *Id*. at 25. Parker's enterprise resource planning ("ERP") system on the eve of the 2017 selling season. *Id*. at 25-6. The decision was made to do so even though the Parker Insiders knew the replacement system was not ready to be rolled out. *Id.* at 26.  The new ERP system was predictably an abject failure. *Id.* 23 – 43. Among other things, in the summer of 2017, Parker lost the ability to accurately track inventory and sales, resulting in orders that were either not filled, or filled multiple times. *Id*. at 23. The inability to accurately and timely supply customers with product was a component of PSU's ultimate demise. *Id.* at 23.

134.    After the June 25, 2015 Sale, Pike, as CEO, was responsible for pressure on the sales team to bring in new customers even during the summer sale season, and to "grow

effectively at any cost." *341 Meeting Transcript*, p. 35.  In 2017, Parker pushed massive growth at a time when Parker did not have the capability of supporting that growth.

135.    On February 1, 2017, the Parker Board held a board meeting at the corporate headquarters in Houston, Texas (the "February 2017 Board Meeting").

136.    The February 2017 Board Meeting was attended by Board Managers Chairman of the Board Adam Norris, Gillis, Pike, Keven Shanahan and Lane Wiggers. Van der Wiel was an observer as Secretary of the Board for the February 2017 Board Meeting.

137.    Pursuant to the "PSU Holdings, LLC and Subsidiary Consolidated Statement of Operations – TTM", for the trailing 12 months periods ending April 30, 2017, (attached hereto as Exhibit M), PSU Holdings' finances reflect the following:

| | |
|---|---|
| Sales: | $33,452,338 |
| Cost of Sales: | $12,444,341 |
| Gross Margin: | $21,007,997 |
| Total Operating Expenses: | $21,577,080 |
| Operating Income (Loss): | (569,084) |
| Net Income (Loss): | (3,459,354) |
| EBITDA: | $1,346,017 |
| Total Enterprise Value: | $16,011,436 |

138.    On May 9, 2017, Parker paid bonuses to the following insiders, above the regular bi-weekly salary payroll in the amounts indicated:[18]

Troy Pike -          May Bonus:   $35,802.00
Don Van der Wiel –   May Bonus:   $36,192.32
Amy A. Balthrope -   May Bonus:    $5,200.00
John Michael Porter – May Bonus: $10,848.47
Susen Sarpa –        May Bonus:    $6,480.01

139.    In May 2017, Balthrope was paid a bonus above salary of $5,200.00.

---

[18] April 25, 2017 payroll wire is $356,637.06 and the next date is May 9, 2017 with a payroll wire amount of $527,891.15.

140.    On June 19, 2017, Parker terminated Balthrope as Vice President of Sales. *See* "Revised Separation Agreement, executed August 2, 2017, Claim No. 140, Desc Attachment 2 (the "Balthrope Severance Agreement").

141.    Pike and Balthrope received May 9, 2017 bonuses and were terminated June 5 and June 19, 2017, thus, the bonuses were not retention bonuses for value for the Debtor to retain their services.

142.    As of September 14, 2017, Balthrope's total shares were 144,344 Class A units and 67,800 Class C for a total of 211,944 for 1.75% of total units.  In 2015 and 2016, Balthrope invested $144,344 or 1.40% of total amount invested in Parker.

143.    Subsequent to the Pike's firing, at the recommendation of Argosy, Parker hired Eric Plott, a "third-party turnaround guy", as interim CEO of Parker. *See 341 Meeting Transcript*, p 42.

144.    On June 26, 2017, the Parker Board held a telephonic meeting (the "June 2017 Board Meeting").

145.    Attending the June 2017 Board Meeting was Chairman of the Board Adam Norris of Salem, Matthew Erbe of Argosy, and Lane Wiggers of Argosy.  Alex Bean of Plexus, Eric Plott, and Van der Wiel attended as observers.

146.    On July 28, 2017, the Parker Board held a board meeting at the Nashville Airport Marriott Hotel (the "July 2017 Board Meeting").

147.    Attending the July 2017 Board Meeting were Chairman of the Board Adam Norris, Mattew Erbe, Gillis, and Lane Wiggers. Alex Bean of Plexus and Eric Plott joined the July 2017 Board Meeting as observers. Sarpa, Porter, Cindy Jorgensen, and Van der Wiel joined the July 2017 Board Meeting via telephone as observers.

148.    The July 28, 2017 Board Meeting discussed a Financial & IT Report, an update on inventory, the sales organization, and other critical issues.

149.    In 2017, Sarpa received **$170,557.19** in "Salary, Bonus, Vacation" Transfers.

150.    In total as of September 14, 2017, and upon information and belief at the Petition Date, Sarpa had 144,344.00 Class A units, and 169,000 Class C units for 2.59% of the total units. In total Sarpa invested $144,344.00 or 1.40% of the total amount invested in PSU Holdings, the sole member of Parker.

**Continued Financial Distress – Default and Return Payments**

151.    During the one-year period prior to the Petition Date, Parker was in extreme financial distress with little to no liquidity.

152.    By December 2016, the Investors were already required to invest an additional $1,385,001 in new money in order to obtain the continued use of the Frost Loan under the 7th Frost Amendment.

153.    On May 23, 2017, a $184,850.92 payment made by Parker on its Capital One Corporate Credit Card was reversed. *See* excerpt of Capital One 06-27-17 Closing Date Statement attached hereto as Exhibit H.

154.    On or before August 2017, Parker escalated paying vendors via its Capital One, N.A. Corporate Card ("Capital One").

155.    Effective August 27, 2017, Parker had a balance on its Capital One credit account in the amount of $1,120,620.86 with a payment due by September 21, 2017. *See* excerpt of Capital One 08-27-17 Closing Date Statement attached hereto as Exhibit I.

156.    On September 20, 2017, Parker made "WEB Transfers" in the amount of $1,120,620.86 to Capital One (the "September 2017 CapOne Payment"). *See* excerpt of Capital One 09-27-17 Closing Date Statement attached hereto as <u>Exhibit J</u>.

157.    On September 25, 2017, the September 2017 CapOne Payment was reversed. *Id*.

158.    In October 2017, Capital One indicated they were going to significantly reduce the size of the credit line to $100,000 or $200,000. *341 Meeting Transcript*, p. 52. Thereafter, Capital One reduced its $2.5 million line of credit to Parker to $650,000 then to $125,000. *See* Capital One 10-27-17 Closing Date Statement and Capital One 11-27-17 Closing Date Statement attached hereto as <u>Exhibit K</u> and <u>Exhibit L</u>, respectively.

159.    On or before October 3, 2017, Parker was in default on 7th Frost Amendment.

160.    On October 4, 2017, Frost Bank sent its "Notice of Default, Demand for Cure, Notice of Intent to Accelerate" regarding a "Specified Default" (the "Notice of Default"), stating "Lender hereby notifies Borrower that the Specified Default has occurred and is continuing under the Loan Agreement and the other loan documents." *See* [D.I. 23-1, pp. 88-90].

161.    The "Specified Default" as set forth in the Notice of Default was identified as Parker's failure to comply with the Loan Rest Covenant of the 7th Frost Amendment. [D.I. 23-1, pp. 88-90].

162.    Pursuant to the Notice of Default, Frost Bank gave Parker a cure date of November 3, 2017. [D.I. 23-1, pp. 88-90].

163.    On November 6, 2017, Frost Bank sent Parker a "Notice of Event of Default, Notice of Acceleration, Notice of Imposition of Default Interest Rate and Reservation of Rights" (the "Notice of Event of Default"). *See* [D.I. 23-1, pp. 92-96].

164.    Gillis of Parker testified "…once the bank pulled their support, which is what we had historically relied upon, there was really very little hope of – of getting the business back to the next season." *341 Meeting Transcript*, p. 44.

**Post-Default Actions by Investors**

165.    Parker gambled on a dual-pronged risky strategy of rapid growth at all costs and the implementation of the new ERB computer system (including the shutdown of its old computer system) during the height of its primary selling season.

166.    This strategy failed. Parker's 2017 gross revenue was $27,708,053.00, compared to gross revenue of $33,993,833.00 in 2016. *S.O.F.A*, p. 5,

167.    Parker's failed execution, along with the failure to perform due diligence and accurately value or account for the Obsolete Inventory, resulted in Parker having reduced revenue, as well as being over-leveraged, undercapitalized, short of cash, and unable to obtain financing from conventional sources.

168.    Due to the Obsolete Inventory, Parker was likely insolvent from the closing of the June 25, 2015 Sale.

169.    In July of 2017, Parker failed to make a payment to Argosy, Salem, and Plexus for the interest on their Subordinated Notes. Salem did not receive a payment for interest in September and October 2017.

170.    Parker's insolvency culminated with the Notice of Default from Frost Bank on November.

171.    Argosy, Salem, and Plexus knew no later than November of 2017 that Parker was insolvent.

**The Debtor Paid Defendant Certain "Salary, Bonus, Vacation" Transfers**

172.    In the year prior to the Petition Date, the Debtor paid Defendant "Salary, Bonus, Vacation" Transfers identified on Exhibit A, all of the Transfers were made after January 1, 2017, and certain Transfers were made on or about or after the Debtor began its cost-cutting and restructuring efforts.

173.    Sarpa received approximately $170,557.19 in Transfers for the Year 2017.  *See* SOFA #4.1; *see also* Exhibit A

174.    The antecedent debt obligations for the Transfers are from the Sarpa Employment Agreement (the "Obligations").

175.    The Plaintiff reserves his right to include, amend, avoid and recover pursuant to the following causes of action, any "Salary, Bonus, Vacation" transfers the Defendant received from June 25, 2015 through December 31, 2016 which would be part of the Additional Transfers.

176.    In July of 2017, Parker failed to make a payment to Argosy, Salem and Plexus for the interest on their Subordinated Notes. Salem did not receive a payment for interest in September and October 2017, and Argosy, Salem and Plexus did not receive payments for interest in November and December 2017, and January 2018.

177.    During the course of this adversary proceeding the Plaintiff may learn (through discovery or otherwise) of additional transfers, to the Defendant from June 25, 2015 through the Petition Date (the "Additional Transfers"), during the Insider Preference Period, the 548 Transfer Period, and/or the Delaware Code Four Year Transfer Period, it is the Plaintiff's intention to avoid and recover all transfers made by the Debtor of an interest of the Debtor in property or for the benefit of the Defendant or any other transferee.

178.    Thus, the Plaintiff reserves his right to amend this Complaint as to include: further information on the Transfers, for further information on the Additional Transfers, revision of Defendant's names, additional defendants, and/or additional causes of action (*i.e.*, but not exclusively, 11 U.S.C. §542, §545, §548 and §544 and 6 Del. C. §§ 1304(a)(2), 1305(a), and 1305(b), NC Gen. Stat. § 39-23.4(a)(2), NC Gen. Stat. § 39-23.5(a) and (b),  TUFTA §24.005(a)(2), TUFTA §24.006(a) and (b), and 11 U.S.C. § 550) (collectively the "Amendments"), that may become known to the Plaintiff at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

## CLAIMS FOR RELIEF

### COUNT I
### (Avoidance of One-Year Transfers - 11 U.S.C. § 547(b))

179.    The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

180.    On or within one-year prior to the Petition Date, the Debtor continued to operate its business affairs, including the transfer of property, either by checks, cashiers' checks, wire transfers, electronic debit, direct deposits, or Capital One, N.A. credit card transfers or otherwise to certain entities, including the Defendant.

181.    The One-year Transfers constitute payments on the Obligations to or for the benefit of the Defendant.

182.    The Defendant received during the Insider Preference Period not less than **$170,557.19**. *See* Exhibit A.

183.    Defendant is an "insider" of the Debtor, as that term is defined pursuant to 11 U.S.C. section 101(31)(B), or at minimum a non-statutory insider.

184.    Defendant was a creditor of the Debtor at the time of the One-year Transfers within the meaning of 11 U.S.C. § 101(10)(A).    At the time of the One-year Transfers, Defendant had a right to payment on account of the Obligations owed to Defendant.

185.    The One-year Transfers were to or for the benefit of creditor Defendant because each One-year Transfer either reduced or fully satisfied a debt or debts then owed by the Debtor.

186.    The One-year Transfers were for, or on account of, antecedent debt(s) owed by the Debtor before such One-year Transfers were made.

187.    The Debtor was insolvent at all times during the ninety (90) days prior to the Petition Date.    Plaintiff is entitled to the presumption of insolvency for each Transfer made during the 90-day Preference Period pursuant to 11 U.S.C. § 547(f).

188.    The Debtor was insolvent at all times during the one-year Insider Preference Period.

189.    As a result of the One-year Transfers, Defendant received more than they would have received if: (i) this case was under chapter 7 of the Bankruptcy Code; (ii) the One-year Transfers had not been made; and (iii) Defendant received payment of such antecedent debts under the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the underlying bankruptcy case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point the unsecured creditors will not receive a full payout of their claims from the Debtor's bankruptcy Estate.

190.    Plaintiff acknowledges that some of the One-year Transfers might be subject to defenses under Bankruptcy Code section 547(c), for which Defendant bear the burden of proof under section 547(g).

191.     In accordance with the foregoing, the One-year Transfers are avoidable pursuant

to 11 U.S.C. § 547(b).

## COUNT II
### (Avoidance of Recovery of Constructive Fraudulent Transfers)
### (11 U.S.C. 548(a)(1)(B)(i) and (ii)(I), (II), (III))

192.     The Plaintiff repeats and re-alleges the allegations of the previous paragraphs of

this Complaint as if fully set forth herein.

193.     Section 548(a) of the Bankruptcy Code provides that:

(a)(1) The trustee may avoid any transfer (including any transfer to or for
the benefit of an insider under an employment contract) of an interest of
the debtor in property, or any obligation (including any obligation to or for
the benefit of an insider under an employment contract) incurred by the
debtor, that was made or incurred on or within 2 years before the date of
the filing of the petition, if the debtor voluntarily or involuntarily-…

(B)     (i) received less than a reasonably equivalent value in
            exchange for such transfer or obligation; and
(ii)     (I) was insolvent on the date that such transfer
             was made or such obligation was incurred, or
             became insolvent as a result of such transfer or
             obligation;
             (II) was engaged in a business or transaction, or was
             about to engage in business or a transaction, for
             which any property remaining with the debtor was
             an unreasonably small capital;
             (III) intended to incur, or believed that the debtor
             would incur, debts that would be beyond the
             debtor's ability to pay as such debts matured; or …

194.     The 548 Transfer Period consists of the two-year period immediately prior to the

Petition Date.

195.     The Defendant received during the 548 Transfer Period not less than **$170,557.19**.

*See* Exhibit A.

196.     The 548 Transfers are an interest of the Debtor in property.

197.    Sarpa was Vice President of Merchandising of Parker at the time the Obligations were incurred and/or the Transfers were made.

198.    Defendant was an officer in control of the Debtor at the time the 548 "Salary, Bonus, Vacation" Transfers were made.

199.    Defendant was a shareholder with a combined 4.84% percent equity interest in the Debtor and was an observer on the Board at the time the Obligations were made.

200.    Defendant was an "insider" of the Debtor, as that term is defined pursuant to 11 U.S.C. section 101(31)(B), or at minimum a non-statutory insider.

201.    The Defendant, had an employment contract with the Debtor, resulting in the alleged Obligations and Transfers.

202.    The Transfers were paid on Obligations (including obligations to or for the benefit of the insider Defendant under an employment contract), incurred by the Debtor.

203.    The Debtor made and Defendant received the 548 Transfers from the Debtor on or within two years prior to the Petition Date.

204.    The Debtor voluntarily or involuntarily paid the 548 Transfers through the control of insider Defendant.

205.    The Debtor received less than reasonably equivalent value in exchange for the 548 Transfers.

206.    Defendant received and benefited from the 548 Transfers from the Debtor.

207.    On the dates the 548 Transfers were made, the Debtor was insolvent or became insolvent as a result of such 548 Transfers.

208.    On the dates of the 548 Transfers, the Debtor was engaged in a business or transaction, or was about to engage in business or a transaction, for which any property

remaining with the Debtor was an unreasonably small capital. Contemporaneous with the 548

Transfers the Debtor: possessed $7 to $10 million of obsolete, un-useable, and worthless

inventory; had either incorrect or invalid financial information per the Dixon Hughes audit;

incurred a financial loss in 2016; had rejected or Reversed payments to creditors; failed to make

its monthly payments in July 2017 on the interest of the Subordinated Notes, and Parker's

finances were leading it to a default of 5th and 7th Frost Amendment.

209.    On the dates of the 548 Transfers and/or Obligations, the Debtor intended to

incur, or believed that it would incur, debts that would be beyond the Debtor's ability to pay as

such debts matured.

210.    The Trustee avers that at the time that Defendant received the 548 Transfers from

the Debtor, the Debtor was unable to pay its debts as they came due from at least May 1, 2017.

211.    The Trustee is entitled to avoid the 548 Transfers and/or Obligations pursuant to

11 U.S.C. §§ 548(a)(1)(B)(i) and (ii)(I), (II) and (III).

## COUNT III

**(Avoidance of Constructive Fraudulent Transfer Under an Employment Contract)**

**(11 U.S.C. 548(a)(1)(B)(i) and (ii)(IV)**

212.    The Plaintiff repeats and re-alleges the allegations of the previous paragraphs of

this Complaint as if fully set forth herein.

213.    Section 548(a)(1)(B)(i), (ii)(IV) of the Bankruptcy Code provides, in relevant

part, that:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for
> the benefit of an insider under an employment contract) of an interest of
> the debtor in property, or any obligation (including any obligation to or for
> the benefit of an insider under an employment contract) incurred by the
> debtor, that was made or incurred on or within 2 years before the date of
> the filing of the petition, if the debtor voluntarily or involuntarily-…

40

> (B)     (i) received less than a reasonably equivalent value
> in exchange for such transfer or obligation; and
> (ii) …; or
>> (IV) made such transfer to or for the benefit of an
>> insider, or incurred such obligation to or for the
>> benefit of an insider, under an employment contract
>> and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B)(i), (ii)(IV).

214.    The Defendant received during the 548 Transfer Period not less than **$170,557.19**. *See* <u>Exhibit A</u>.

215.    The Transfers are an interest of the Debtor in property.

216.    Sarpa was Vice President of Merchandising of Parker at the time the Obligations were incurred and/or the Transfers were made.

217.    The Defendant is an "insider" of the Debtor, as that term is defined pursuant to 11 U.S.C. section 101(31)(B), or at minimum a non-statutory insider.

218.    The Transfers were "transfers" Parker made within 2 years of the Petition Date.

219.    At the time Sarpa became entitled to the Transfers and/or Obligations, Sarpa was an insider of the Parker for purposes of sections 101 and 548 of the Bankruptcy Code.

220.    Sarpa had an Employment Agreement, which constitutes an "employment contract" with the Debtor, resulting in the alleged Obligations and Transfers.

221.    The Sarpa Employment Agreement and the Obligations and Transfers were all incurred by Parker for the benefit of an insider under an employment contract.

222.    The Transfers were paid on Obligations (including obligations to or for the benefit of the insider Defendant under an employment contract), incurred by the Debtor.

223.    The Transfers were transferred outside the ordinary course of Parker's business.

224.    Each of the Transfers were made or incurred without reasonably equivalent value. Sarpa received the Transfers notwithstanding the fact that, other than the value of the services he already provided to Parker for which he received regular salary compensation, Sarpa provided no reasonably equivalent value to the Parker.

225.    Pursuant to section 548 of the Bankruptcy Code, each of the Transfers constitutes a voidable fraudulent transfer that should be avoided and Sarpa should be required to repay to Parker the Transfers.

226.    The Debtor voluntarily, or involuntarily through the control of the insider Defendant, made the Transfers, or incurred the Obligations, and received less than reasonably equivalent value in exchange the Transfers.

227.    The Transfers were not made by the Debtor, and the Obligations were not incurred by the Debtor, in the ordinary course of business as the Debtor had incurred: $7 to $10 million of obsolete, un-useable and worthless inventory as of June 25, 2015, the May 10, 2017 audit could not determine the value of the inventory from June 25, 2015 through December 31, 2016, a 2016 financial loss, an investor's equity had a 73.3% devaluation from June 25, 2015 to April 30, 2017, Parker was bouncing payments to creditors, in July 2017 Parker failed to make its monthly payments on the interest of the Subordinated notes, and Parker's finances were leading it to a default of the Frost Loan Agreement.

228.    The Trustee is entitled to avoid the Transfers and/or Obligations pursuant to 11 U.S.C. §§548 (a)(1)(B)(i) and (ii)(IV).

**COUNT IV**
**Avoidance of Constructive Fraudulent Transfers -11 U.S.C. § 544 & 6 Del. C. § 1304(a)(2),**
**NC Gen. Stat. § 39-23.4(a)(2), and TUFTA §24.005(a)(2)**

229.    The Plaintiff repeats and re-alleges the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

230.    The Bankruptcy Code, pursuant to section 544(b) states in pertinent part that "… the Trustee may avoid any transfer of an interest of the debtor in property… that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under 502 of this title…".

231.    The Del. C. Transfers were made on or within four years of the date of the Complaint and/or during the Delaware Code Four Year Transfer Period from January 13, 2014 to January 12, 2018, as identified on Exhibit A.

232.    The Del. C. Transfers are an interest of the Debtor in property.

233.    The Defendant received **$170,557.19** during the Delaware Code Four Year Transfer Period from January 13, 2014 through the Petition Date.  *See* Exhibit A.

234.    Defendant received and benefited from the Del. C. Transfers from the Debtor.

235.    The Debtor voluntarily or involuntarily paid the Del. C. Transfers through the control of the insider Defendant and received less than reasonably equivalent value in exchange for the Del. C. Transfers.

236.    Defendant received and benefited from the Del. C. Transfers.

237.    The Debtor was insolvent on the dates that all Del. C. Transfers were made to the Defendant or became insolvent as a result of such Del. C. Transfers on the dates the Del. C. Transfers were made to the Defendant.

238.    On the dates of the Del. C. Transfers, the Debtor was engaged in a business or transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital. Contemporaneous with the 548

Case 19-51173-CSS    Doc 1    Filed 12/23/19    Page 44 of 52


Transfers the Debtor: possessed $7 to $10 million of obsolete, un-useable, and worthless inventory; had either incorrect or invalid financial information per the Dixon Hughes audit; incurred a financial loss in 2016; had rejected or Reversed payments to creditors; failed to make its monthly payments in July 2017 on the interest of the Subordinated Notes, and Parker's finances were leading it to a default of 5th and 7th Frost Amendment.

239.    At the time each of the Del. C. Transfers were made, the Defendant intended for the Debtor to incur, or believed or reasonably should have believed that the Debtor would be left with unreasonably small capital and would incur, debts that would be beyond the Debtor's ability to pay as such debts became due.

240.    At the time each of the Del. C. Transfers were made, the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

241.    The Del. C. Transfers consisted of transfers made by the Debtor for the benefit of the Defendant and caused the Debtor's other obligations to go unsatisfied.

242.    The Debtor has creditors whose claims arose before the Del. C. Transfers were made.

243.    The Del. C. Transfers caused the unsecured creditors of the Debtor to be harmed by rendering the Debtor unable to pay its debts.

244.    Each of the Del. C. Transfers is avoidable under 6 Del. C. § 1304(a) of the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1301 *et. seq*. (the "Delaware UFTA") under NC Gen. Stat. § 39-23.4(a)(2), and under TUFTA §24.005(a)(2) by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.

245.     The Del. C. Transfers are voidable transfers pursuant to the section 1304(a)(2) of the Delaware UFTA under NC Gen. Stat. § 39-23.4(a)(2), and under TUFTA §24.005(a)(2) as made applicable pursuant to section 544(b)(1) of the Bankruptcy Code based on lack of reasonably equivalent value.

**COUNT V**
**Avoidance of Constructive Fraudulent Transfers - 11 U.S.C. § 544 & 6 Del. C. § 1305(a),**
**NC Gen. Stat. § 39-23.5(a), and TUFTA §24.006(a).**

246.     The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

247.     The Bankruptcy Code, pursuant to section 544(b) states in pertinent part that "… the Trustee may avoid any transfer of an interest of the debtor in property… that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under 502 of this title…".

248.     The Defendant received **$170,557.19** during the Delaware Code Four Year Transfer Period from January 13, 2014 through the Petition Date.  *See* Exhibit A.

249.     The Del. C. Transfers were made on or within four years of the date of the Complaint and/or during the Delaware Code Four Year Transfer Period from January 13, 2014 to January 12, 2018, as identified on Exhibit A.

250.     The Del. C. Transfers are an interest of the Debtor in property.

251.     The Debtor received less than reasonably equivalent value in exchange for the Del. C. Transfers.

252.     The Debtor was insolvent on the dates that all Del. C. Transfers were made to the Defendant, or the Debtor became insolvent as a result of the Del. C. Transfers.

253.    The Del. C. Transfers were paid on obligations to or for the benefit of the Defendant for the interest on the Plexus Subordinated Notes.

254.    Defendant received and benefited from the Del. C. Transfers.

255.    The Debtor has creditors whose claims arose before the Del. C. Transfers were made.

256.    The Del. C. Transfers caused the unsecured creditors of the Debtor to be harmed by rendering the Debtor unable to pay its debts.

257.    Under section 1305(a) of the Delaware UFTA, under NC Gen. Stat. § 39-23.5(a), and under TUFTA §24.006(a) each of the Del. C. Transfers is avoidable by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.

258.    The Del. C. Transfers are voidable transfers pursuant to section 1305(a) of the Delaware UFTA, NC Gen. Stat. § 39-23.5(a), and TUFTA §24.006(a) as made applicable pursuant to section 544(b)(1) of the Bankruptcy Code based on lack of reasonably equivalent value.

**COUNT VI**
**Avoidance of Constructive Fraudulent Transfers 11 U.S.C. §544 & 6 Del. C. §1305(b), and/or NC Gen. Stat. § 39-23.5(b), and/or TUFTA §24.006(b).**

259.    The Paintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

260.    The Bankruptcy Code, pursuant to § 544(b) states in pertinent part that "… the Trustee may avoid any transfer of an interest of the debtor in property… that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under 502 of this title…".

261.    The applicable law, at 6 Del. C. §1305(b) states that:

A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time, and the insider had reasonable cause to believe that the debtor was insolvent.

262.    The Defendant received **$170,557.19** during the Delaware Code Insider Preference Period from January 13, 2014 through the Petition Date. *See* Exhibit A.

263.    At the time the Defendant became entitled to the One-year Transfers, the Defendant was an insider of the Debtor within the meaning of the definition at 6 Del. C. §1301(7)(b), (c), or (d), and §1301(1), TUFTA §24.002(7) or TUFTA §24.002(1), or NC Gen. Stat. § 39-23.1(7) or NC Gen. Stat. § 39-23.1(1).

264.    The One-year Transfers are an interest of the Debtor in property.

265.    The Defendant received and benefited from the One-year Transfers from the Debtor.

266.    The One-year Transfers constitute payments on Obligations to or for the benefit of the Defendant for the Transfers under the employment contract.

267.    Sarpa was Vice President of Merchandising of Parker at the time the Obligations were incurred and/or the Transfers were made.

268.    The antecedent debt arose from the insider Sarpa Employment Agreement, resulting in the alleged Obligations and Transfers.

269.    The Sarpa Employment Agreement and the Obligations and Transfers were all incurred by Parker for the benefit of an insider.

270.    At the time Sarpa became entitled to the Transfers and/or Obligations, Sarpa was an insider of the Parker for purposes of sections 101 and 548 of the Bankruptcy Code.

271.    In July of 2017, Parker failed to make a payment to Argosy, Salem, and Plexus for the interest on their Subordinated Notes. Salem did not receive a payment for interest in September and October 2017, and Argosy, Salem, and Plexus did not receive payments for interest in November and December 2017, and January 2018.

272.    The Debtor was insolvent at the time of the One-year Transfers or became insolvent as a result of the One-year Transfers.

273.    At the time of the One-year Transfers, the Defendant had reasonable cause to believe that the Debtor was insolvent.

274.    At the time of the One-year Transfers, the Debtor's debts were greater than all of the Debtor's assets, at a fair valuation.

275.    At the time of the One-year Transfers, the assets and enterprise value of the Debtor was significantly less than the liabilities.

276.    At the time of, and prior to, the One-year Transfers, the Debtor had not been paying its debts as they came due.

277.    The Debtor has creditors whose claims arose before the One-year Transfers were made or Obligations were incurred.

278.    The One-year Transfers caused the unsecured creditors of the Debtor to be harmed by rendering the Debtor unable to pay its debts.

279.    Under Section 1305(b) of the Delaware UFTA, under NC Gen. Stat. § 39-23.5(b), and under TUFTA §24.006(b), each of the One-year Transfers is voidable by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.

280.    The One-year Transfers are avoidable transfers pursuant to section 1305(b) of the Delaware UFTA, and/or NC Gen. Stat. § 39-23.5(b), and/or TUFTA §24.006(b) as made applicable pursuant to § 544(b)(1) of the Bankruptcy Code.

## COUNT VII
### Recovery of Avoided Transfers - 11 U.S.C. § 550 & 6 Del.C. § 1307,
### N.C. Gen. Stat. § 39-23.7, and/or TUFTA §24.008.

281.    The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

282.    Trustee is entitled to avoid the Transfers pursuant to 11 U.S.C. §§ 547, 548, 544(b) and 6 Del. C. §§ 1304 and 1305, and/or NC Gen. Stat. § 39-23.4 and NC Gen. Stat. § 39-23.5, and/or TUFTA §24.005 and TUFTA §24.006.

283.    The Defendant was the initial transferee of the Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Transfers were made.

284.    Pursuant to 11 U.S.C. § 550(a) and 6 Del. C. § 1307, N.C. Gen. Stat. § 39-23.7, and/or TUFTA §24.008, the Plaintiff is entitled to recover from the Defendant the Transfers, plus interest thereon to the date of payment and the costs of this action.

## COUNT VIII
### (Disallowance of all Claims - 11 U.S.C. § 502(d) and (j))

285.    The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

286.    The Defendant is an individual from which property is recoverable under 11 U.S.C. § 550 of the Bankruptcy Code.

287.    The Defendant is a transferee of the Transfers avoidable under 11 U.S.C. §§ 547, 548, and/or 544(b) and 6 Del C. §§ 1304 and/or 1305, and/or NC Gen. Stat. § 39-23.4 and NC Gen. Stat. § 39-23.5, and/or TUFTA §24.005 and TUFTA §24.006.

288.    The Defendant has not paid the amount of Transfers, or turned over such property, for which the Defendant is liable under Section 550 of the Bankruptcy Code.

289.    Pursuant to 11 U.S.C. § 502(d), any and all Claims of the Defendant against the Estate or the Plaintiff must be disallowed until such time as the Defendant pays to the Plaintiff an amount equal to the aggregate amount of all the Transfers, plus interest thereon and costs.

290.    Pursuant to 11 U.S.C. § 502(j), any and all Claims of the Defendant, and/or its assignee, against the Estate or the Plaintiff previously allowed by the Debtor or the Plaintiff, must be reconsidered and disallowed until such time as the Defendant pay to the Plaintiff an amount equal to the aggregate amount of all the Transfers.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests that this Court grant him the following relief against the Defendant:

A.    Avoiding the Transfers pursuant to 11 U.S.C. §§ 547, 548, and/or 544(b) of the Bankruptcy Code and 6 Del C. §§ 1304 and/or 1305(a) and/or (b); and/or NC Gen. Stat. § 39-23.4 and NC Gen. Stat. § 39-23.5(a) and/or (b), and/or TUFTA §24.005 and TUFTA §24.006(a) and/or (b);

B.    Granting judgment in favor of the Plaintiff against the Defendant in an amount of **$170,557.19** (the "Judgment Amount");

C.    Requiring the Defendant to immediately to pay the Judgment Amount to the Plaintiff pursuant to 11 U.S.C. § 550(a) and 6 Del.C. § 1307, N.C. Gen. Stat. § 39-23.7, and/or TUFTA §24.008;

D.    Disallowing pursuant to 11 U.S.C. § 502 any Claims of the Defendant, and/or their assignees, if Defendant refuses to turn over any transfers to the Plaintiff;

E.      Awarding pre-judgment and post judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full, plus costs;

F.      Granting the Plaintiff such other and further relief as the Court deems just and proper.

COOCH AND TAYLOR, P.A.


 /s/ Robert W. Pedigo
Robert W. Pedigo (#4047)
R. Grant Dick (#5123)
The Nemours Building
1007 N. Orange Street, Suite 1120
P.O. Box 1680
Wilmington, DE   19899-1680
Telephone: (302) 984-3832
Fax: (302) 984-3939
E-mail: rpedigo@coochtaylor.com
E-mail: gdick@coochtaylor.com

and

Patrick J. Coffin, Esquire
Elliott, Thomason & Gibson, LLP
2626 Cole Ave., Suite 600
Dallas TX 75204
214.377.4848 Tel
214.377.4858 Fax
patrick@etglawfirm.com

and

Steven D. Sanfelippo, Esquire
Cunningham Swaim, L.L.P.
7557 Rambler Road
Suite 440
Dallas, Texas 75231
Telephone: (214) 646-1495
Facsimile: (214) 613-1163
ssanfelippo@cunninghamswaim.com
rcunningham@cunninghamswaim.com

*Special Counsel for Jeoffrey L. Burtch, Chapter 7*
*Trustee of Parker School Uniforms, LLC*

December 23, 2019